Docketed MDN  MAY 3 1 2000

## UNITED STATES BANKRUPTCY COURT
### for the
### DISTRICT OF NEW HAMPSHIRE

FILED

2000 MAY 30 '⁻ 4: 52

CLERK OF THE
DISTRICT OF N.H.

-----------------------------------------------------

In re:

**SHEPHERDS HILL DEVELOPMENT CO., LLC**

        Debtor

-----------------------------------------------------

CHAPTER 11
Case No. BK-99-11087-JMD

Hearing Date:  June 27, 2000
Hearing Time:  10:00 a.m.

## PROPONENT'S SECOND AMENDED DISCLOSURE STATEMENT PERTAINING TO SECOND AMENDED PLAN OF REORGANIZATION DATED MAY 30, 2000

Pursuant to Section 1125 of the Bankruptcy Code of 1978, as amended, 11

U.S.C. §101 et seq. (the "Bankruptcy Code"), Caesar Balzotti, Ralph Caruso and Ernest

Thibeault (singly, the "Participants" and, collectively, the "Proponent") are submitting this

Second Amended Disclosure Statement Pertaining to the referenced Plan of

Reorganization accompanying this Disclosure Statement to the Debtor's Creditors,

Equity Holders and other parties in interest (collectively, the "Recipients").  The term

"Debtor" means Shepherds Hill Development Co., L. L. C. itself, but not Edmond J. Ford,

Trustee of the Debtor's Estate.  As used herein, the term "Reorganized Debtor" means

the Debtor following Final Confirmation.

Respectfully submitted,

DATED: May 30, 2000

William S. Gannon, BNH 1222

Attorney for:

CAESAR BALZOTTI

WADLEIGH, STARR & PETERS P.L.L.C.
95 Market Street
Manchester NH   03101
PH: 603-669-4140

DATED: May 30, 2000

Edward A. Jordan

Attorney for:

RALPH CARUSO and ERNEST THIBEAULT

JORDAN, MAYNARD & PARODI, PLLC
40 East Pearl Street
Nashua   NH    03060]
(603) 881-5800

G:\D42000\42401\DISCPLAN\DISC3.530 - Pg. 2
2:00 p.m. 5/30/00

## 1.0 INTRODUCTION; OVERVIEW AND DEFINITIONS

**1.1    No Judgement by Court on Merits of Plan.**  After a contested hearing on the adequacy of this Disclosure Statement, the Court found *only* that it provides Creditors with "adequate information" -- the information necessary for creditors to arrive at a reasonably informed decision with respect to the Plan – and authorized the Proponent to submit this Disclosure Statement to all known Creditors, Equity Holders and Other Parties in Interest (the "Recipients") for the purpose of soliciting their acceptances of the Plan which accompanies it.  The approval of this Disclosure Statement by the Court does not constitute recommendation by the Court as to the merits of the Plan. Not until the Confirmation Hearing will the Court make any judgement regarding the desirability or feasibility of the Plan, the probability of its successful implementation, or the value or suitability of any consideration offered by the Plan.

**1.2    Formulation of Plan; Overview.**

**1.2.1. The Proponent.**  Balzotti, Caruso and Thibeault and their construction and development companies (collectively, the "Participants") are extremely experienced, qualified and successful contractors. Balzotti and Platinum Construction Services, Inc. ("Platinum Construction") have engaged in the roofing, general construction and real estate development business for more than 20 years.  Caruso and his principal operating company, Caruso Equipment Company, Inc. ("Caruso Equipment") have undertaken and completed infrastructure contracts larger and more complex than that which will have to be done as part of the development of the Project and constructed significant residential real estate projects for their own account.  Thibeault and his

company, Thibeault Corp. of New England ("Thibeault Corporation"), have become one of New England's largest infrastructure contractors over the last five years. At the hearing on the confirmation of the Plan (the "Confirmation Hearing"), the Proponent will establish the fact that the Proponent has the experience, financial capacity and qualifications necessary to implement the Plan.

**1.2.2. Formulation of Plan.** In formulating the Plan, the Proponent relied primarily on its Participants' expertise, knowledge and familiarity with the site, the nature and extent of the construction which will be required to develop the project and the local real estate market. The Participants reviewed and considered to some degree the bids submitted to Platinum by other contractors, the Project Budget prepared by Winn Development Company, Inc. ("Winn Development Company"), and the approval and unit value opinions expressed to them by various real estate brokers and developers, including Silvestri Construction Company, Inc. ("Silvestri Construction") and Robert Richard ("Richard"). The Participants alternately decided, among other things, that: (a) the Proponent concluded that the infrastructure could be built for $3,000,000 or less; (b) on average, the units will cost $70,000 to build, exclusive of infrastructure cost; (c) on average, the units will sell for $140,000 or more to consumers; (d) Creditors holding Allowed Claims other than Class 5 and 6 Creditors will be paid in full, exclusive of interest, if paid $20,000 per approval assuming that 400 Unit Sites are sold or developed at an average price or value of $20,000 each of $8,000,000 in the aggregate (the "Dividend Cap"), an amount within the range of value established by Richard in his expert testimony during the hearing on the motion filed to vacate the so-called Brisben

Sale Order; and (e) the market will absorb 400 units constructed on the real estate within 5 years (the "Absorption Period" or "Plan Term"). Given their knowledge of construction cost and expense and the marketplace, the Proponentdecided that it could, and would fund the Plan by completing the development of the Project.

### 1.2.3. Plan Overview.

A.     On the date on which the Court approved this Disclosure Staement, the Proponent deposited the sum of $100,000 with the Trustee (the "Initial Confirmation Deposit"). An additional $200,000 will be deposited on Final Confirmation  (the "Second Confirmation Deposit").  The Proponent will also pay an amount equal to $75,000, less the engineering and legal costs incurred in connection with preparing, submitting and obtaining the approval of its Condominium Application (singly the "Third Deposit" and, collectively the "Confirmation Deposit").  Under the terms of the Plan, the Confirmation Deposit will be used to pay Allowed Administrative Claims, including Hudson, the Class 1 Claim held by Hudson and the balance to Vigeant.

B.     Under the Plan, each Participant will form a New Hampshire limited liability company which will own a part of the Reorganized Debtor and the Development Contractor which will act as the general contractor for the completion of the Project.  The Reorganized Debtor will prepare, secure the approval of and recorda Declaration of Condominium in order to legally divide the real property into a series of phases or villages consisting of approximately 50 units each (the "Condominium Declaration" and the "Phases") which can be financed and developed separately. Although there is no assurance that the Office of the Attorney General will approve the condominium

application, the Proponent and its condominium council, Edward A. Jordan, Esq., believe

that it will approve, and register the condominium within 60 days from the submittal date.

        C.      Under the Plan, Hudson, Leonard Vigeant ("Vigeant") and Combat

will retain their liens on the Debtor's Property as security for the payment of their Allowed

Claims. The Development Contractor and Caruso Equipment or Thibeault Corp.(the

"Infrastructure Contractor") will enter into a contract for the construction of the so-called

"Loop Road" and the related infrastructure (the "First Infrastructure Contract"). It will

obligate the Infrastructure Contractor to build the Loop Road Infrastructure for the sum of

$1,900,000 which will be paid from the net proceeds of each sale of a Unit or an

approval or site on which a Unit can be built (a "Unit Site") and include a provision under

which the Infrastructure Contractor waives and relinquishes its lien rights under RSA 447

(the "Lien Law").  Since the Infrastructure Contractor will be providing the Reorganized

Debtor with $1,900,000 in financing, the Reorganized Debtor will grant it a mortgage of

the real property which is, and will continue to be junior to the Liens held by Hudson,

Vigeant and Combat, as modified by the Plan.

        D.      Over the term of the Plan, the Reorganized Debtor will develop the

Phases or Villages created by the recordation of the Condominium Declaration alone or

in conjunction with one or more contractors.  The first $20,000 of each construction loan

granted to the Reorganized Debtor will be used to pay Creditors holding Allowed Claims

in this case in full (the "Distributable Loan Proceeds").  All of the Distributable Loan

Proceeds available to the Reorganized Debtor will be paid to the most Senior Class of

Creditors on a pro rata basis or their Agent in the case of Class 4 Creditors until such

time as the Creditors holding Allowed Claims in that Class have been paid in full and then to the Creditors in the next most Senior Class. Assuming that the Reorganized Debtor borrows $1,000,000 from Caruso to finance the construction of the units in the first Phase, the Distributable Loan Proceeds will be paid to (a) Hudson should it not have been paid in full from the Confirmation Process and then to (b) Vigeant.

E.    At the moment, the Proponent expects the Condominium Declaration to be filed on or before June 27, 2000 and approved prior to August 27, 2000. The Proponent believes that the Infrastructure Contractor will begin building the Infrastructure no later than July 1, 2000. The development of the first Phase may not begin until September 1, 2000. The first dividend payment should be made on or before Sept. 1, 2000 based on the projected construction schedule. Thereafter, dividends will be paid from Distributable Loan Proceeds as additional Phases which the Proponent does not expect to extend beyond the Plan Term.

F.    In addition, the Reorganized Debtor will pay Creditors holding Allowed Claims dividends from any Net Recovery in the adversary proceeding or civil action to be filed against RAD Investments LLC and Robert Dianni (the "RAD Litigation") and any adversary proceeding filed against Credit Suisse as more particularly described in the Plan. Litigation is always uncertain. In this case, however, the Proponent believes that the causes of action to be asserted against RAD and Dianni have significant merit and that any judgment rendered against them can be recovered for the benefit of Creditors.

**1.2.4. Critical Assumptions.** Putting aside the RAD Litigation, the Proponent

assumed, among other things, that:

A.      The Allowed Claim held by Vigeant, as determined by the Court does not exceed $3,300,000.  To the extent that it does, the Claim held by Platinum shall be reduced on a dollar-for-dollar basis.

B.      The development permits issued by Hudson are vested through at least October 28, 2000 so that the first 50 units can be built and sold for enough money to pay the Infrastructure Contractor, an assumption that seems fair and reasonable given the fact that the selectmen withdrew their appeal from the zoning administrator' decision that the permits are vested through October 28, and that the zoning variance authorizing the construction of 400 Units on the Real Estate runs with the land and will remain valid, enforceable and in full force and effect even if the other Development Permits should become subject to changes in Hudson's ordinances and regulations governing the development of the Real Estate.  In addition, the Proponent will seek an order determining the length of time that the Development Permits will continue to be vested following Confirmation.

C.      Thibeault Corp. has the expertise and financial capacity to construct the Loop Road Infrastructure and wait to be paid from the net proceeds of unit sales, an assumption which is critical to the implementation of the Plan.

D.      The office of the New Hampshire Attorney General will approve the Condominium Declaration to be filed by Reorganized Debtor within 60 days although a 30-day delay should not prevent the implementation of the Plan.

E.      The Proponent will be able to borrow or raise $1,000,000 to secure

the partial discharges or releases of the Retained Liens, an assumption which is critical to the implementation of the Plan, but it seems to be well within the capacity and control of Caruso.

   F. One or more developers will enter into phase development agreements with the Reorganized Debtor which will accelerate the development of the Project and absorption of units within it, an assumption which the Proponent believes will prove to be correct, but is not critical to the implementation of the Plan.

**1.3 No Guaranty of Success; General Disclaimers.**

   **1.3.1. No Guaranty of Success.** In this case, the Dividends to be paid Creditors will be derived solely and exclusively from the Post-Confirmation development of the Project and the Net Recoveries of the RAD Litigation and limited by the Dividend Cap. No guaranties can or will be given regarding the successful development of the Project. On the other hand, Confirmation of the Plan commits the Proponents and their companies to advance and/or spend $3,000,000 of their own funds for the successful implementation of the Plan and assures the construction of the Loop Road Infrastructure and the construction and sale of the first 50 Units, albeit on a secured basis.

   **1.3.2. General Disclaimers.**

   A. No representations concerning the Debtor, Reorganized Debtor or the Plan other than set forth in it have been or will be authorized by the Proponent or the Proponent's attorneys.

   B. Neither the Proponent nor the Proponent's counsel make or will make any representation other than those contained herein and that the information

contained in this Disclosure Statement is believed to be correct at the time of the filing

of the Disclosure Statement.

        C.    Recipients may not, and should not rely on any representations or

inducements made to secure their votes or acceptances other than those contained in

this Disclosure Statement, nor should any such representations or inducements made

in by parties urging Creditors to vote against the Plan.

        D.    No financial information contained in this Disclosure Statement has

been subject to a certified audit.  The financial information  contained in this Disclosure

Statement has been provided by Debtor.  All statements concerning financial data are

made in good faith and are intended to be as complete and as accurate as possible

within these limitations.

        E.    The statements contained in this Disclosure Statement are made

as of the date hereof unless another time is specified herein, and the delivery of this

Disclosure Statement shall not, under any circumstances, create any implication that

the information contained herein is correct as of any time subsequent to the date

hereof.

**1.4**    **Debtor's Recommendation; Comparison of Plan and Liquidation.**  In the

Proponent's opinion, Creditors holding Allowed Claims will undoubtedly receive far more

Dividends under the Plan than they have any hope of receiving in a Liquidation or any

other alternative. Attached as Exhibit A is a Table which compares the projected

Dividends to be paid pursuant to the Plan based on the construction of 50, 100, 150 and

200 Units to those which might be received by Classes of Creditors in a liquidation

shows that Confirmation of the Plan is clearly in the best interests of Creditors as a whole.

**1.5     Definitions and Rules of Construction; Exhibits.**

**1.5.1. Special Definitions.**

A.     The Special Definitions given in the Plan are incorporated herein by reference.

**1.5.2. Plan Definitions and Rules of Construction.**  Incorporated into this Disclosure Statement by reference are the rules of construction and definitions given to words, terms and phrases in the Plan which accompanies this Disclosure Statement, including the Glossary attached as Exhibit A[1] to the Plan (the "Glossary").

**1.5.3. Code Definitions and Rules of Construction.**  Any word, phrase or term of art which is used in this Disclosure Statement, but is not defined in this Disclosure Statement or the Plan shall have the same meaning as is attributed or given to it in the Code or the Federal Rules of Bankruptcy Procedure (collectively, the "FRBP" or "Bankruptcy Rules").  In addition, the rules of construction set forth in the Code and Bankruptcy Rules are incorporated by reference.

**1.6    Exhibits.**  In preparing this Disclosure Statement, the Debtor had to make judgments regarding which documents were essential to the Recipients' ability to make an informed judgment regarding the merits of the Plan.  Attached as Exhibits are the Documents and Projections which the Proponent believes Recipients must have in order

---

[1]      In accordance with the Local Bankruptcy Rules (collectively, the "LBR"), the Plan is not treated as an Exhibit to this Disclosure Statement, but does accompany it.

to evaluate the Plan and its prospects for success, including the Development Agreement.  Other Documents and Projections may be referred to in this Disclosure Statement. If any Recipient would like a copy of any Other Document, the Proponent will provide a copy of each Other Document identified with reasonable specificity in a written request submitted to Jeanne Arquette-Koehler, Wadleigh, Starr & Peters, PLLC, 95 Market Street, Manchester, NH   03101.

**1.7   Dates.**

**1.7.1. Projected Dates.**  For the purposes of this Disclosure Statement, the Debtor has assumed that (i) the Court will enter its Confirmation Order on July 1, 2000 (the "Confirmation Date"), (ii) such Order will become final 10 days later (the "Final Confirmation Date") and that (iii) the Plan will become effective 30 days following the Projected Final Confirmation Date (the "Effective Date").  If, and to the extent that the Confirmation Date or Effective Date are later than the Projected Dates, all other dates given in this Disclosure Statement which are themselves projections shall be extended automatically.

**1.7.2. Disclosure Date; Information Dates.**

A.      "Disclosure Date" means the date of this Disclosure Statement.

B.       "Information Dates"

1)      Estimates, information and Projections given or provided to Recipients in this Disclosure Statement shall be deemed to have been made based on circumstances, events and facts known to the Proponent as of the date specified by the Proponent, if any.

2)     Unless otherwise specified in this Disclosure Statement, all of the estimates, information and projections made in this Disclosure Statement are based on the circumstances, data, events, facts and other information known to the Debtor at the end of the month preceding the date of this Disclosure Statement (the "Information Date").

## 2.0     THE DEBTOR; COMMENCEMENT OF CASE AND PETITION SUMMARY

**2.1     Commencement of Case; Primary Reasons.**   On or about April 2, 1999 (the "Petition Date"), the Debtor commenced this reorganization case by filing its Voluntary Petition under Chapter 11 of the Bankruptcy Code.  Vigeant forced the Debtor to seek protection under the Code by serving a Notice of Mortgagee's Sale on the Debtor.  The Debtor's managing member, Anthony F. Balzotti in consultation with the Debtor's former counsel, Steven M. Notinger, Esquire, concluded that the Debtor could not protect the value of its Development Property outside of a reorganization case.  Further, making the Development Permits property of the Estate within the meaning of Section 541 seemed to provide more protection that would be available under state law.

**2.2     The Debtor, Affiliates, Insiders and Co-Debtors.**

**2.2.1. The Debtor and its Equity Holders.**  The Debtor is a New Hampshire limited liability company formed by the execution of its Operating Agreement (the "Operating Agreement").  Its members are Anthony Balzotti, Dawn Balzotti, Michael Balzotti, Ann Burgess, Pamela Dritt and Thomas Iarrabino.  Dawn Balzotti holds the interest originally purchased by Lisa McDonough according to Caesar Balzotti although he may be obligated to repay her investment alone or as a co-obligor with Dawn

Balzotti.  Caesar Balzotti is not, and has never been a Member of the Debtor.  Contrary to the Trustee's allegation, the fact that Caesar Balzotti has been a manager of the Debtor does not make him a member.  At no time have any of the Proponents been a Member of the Debtor in the Proponent's opinion.

**2.2.2.  Affiliates and Insiders.**  Caesar Balzotti owns Platinum Construction Co., Inc. ("Platinum"), a significant  Creditor of the Estate.  Discovery done by the Trustee, Edmond J. Ford, Esquire (the "Trustee") suggests that Caesar Balzotti may be a Creditor in his own right.  Platinum is not an affiliate in the Proponent's opinion although the Proponent recognizes that the Trustee, Edmond J. Ford, Esquire (the "Trustee") and the Assistant U.S. Trustee may take a contrary position.  Caesar Balzotti may be an Insider.  Except for the existing Equity Holders and Caesar Balzotti if the Court should determine that he is an Insider, no other Insiders are known to the Proponent.

**2.2.3.  Co-Debtors.** Platinum may be a Co-Debtor with respect to the Claims asserted by Combat Corporation ("Combat") and Maine Drilling & Blasting, Inc. ("Maine Drilling").  Except for Platinum, the Proponent does not believe that there are any other Co-Debtors involved in this Case.

**2.2.4.  Related Case and Proceedings.**  No bankruptcycase has been filed by the Debtor in any other forum or by any of the Debtor's Equity Holders in any forum (a "Related Case").  Except for any other Proceedings involving the Debtor which are described in the Article captioned "Known Actions and Proceedings, if Any", the Debtor is not a party to any other Proceeding, as such term is defined in the referenced Article.

**2.3   Petition Date Assets and Liabilities.** Shortly after the Petition Date, the Debtor

filed its Statement of Financial Affairs, Schedules and Summary of Assets and

Liabilities (collectively, the "Petition") which are part of the public record of this Case

and can be reviewed by any Recipient at the Office of the Clerk of the Court during

normal business hours.  On the Petition Date, all of the Debtor's real and personal

property became "property of the estate" (the "Property" or "Property of the Estate")

subject to the Claims and Equity Interests held by its Creditors and Equity Holders.

**2.3.1. Petition Date Assets.**  In Schedules A and B  (the "Asset Schedules"), the

Debtor described and valued its real and personal property at its "market value" "without

deduction" for Liens as of the Petition Date as follows:

      A.      Schedule A -- Real Property $7.500.000;

      B.      Schedule B -- Personal Property $200.

**2.3.2. Petition Date Liabilities.**  In Schedules D, E and F, the Debtor categorized

and listed the Claims asserted by Creditors as follows:

      A.      Schedule D --"Creditors Holding Secured Claims", $3,275,000;

      B.      Schedule E -- "Priority Claims, $0.00; and

      C.      Schedule F --"Unsecured Claims", $3,925,915.

**2.3.3. Summary of Schedules.**  Attached as *Exhibit B* is a copy of the Debtor's

Summary of Schedules filed as part of the Petition.

**3.0  OPERATIONS, SIGNIFICANT EVENTS AND TRANSACTIONS DURING CASE**

**3.1  Operations During Case.**  The Debtor's operations during the term of this Case

have been necessarily limited to attempting to find or locate a buyer, equity funder,

lender or a joint venturer so that the Project could be completed for the benefit of

Creditors holding Allowed Claims and Equity Holders if at all possible.

**3.2   No Payments, Compromises or Transactions During Term of Case.**   No payments have been made to any Creditor or Equity Holder during the term of this Case. The Debtor has not divested itself of any Property during the term of this Case.   Further, the Debtor has not compromised or settled any Action which it has, or might have against any person.

**3.3   Appointment of Trustee.**   During late February or early March, 2000, the Court authorized the United States Trustee to appoint a trustee in this case.   The Assistant U.S. Trustee, Geraldine B. Karonis, Esquire, appointed the Trustee, a member of the Standing Trustee's Panel.   The Trustee then opposed the effort to vacate the Purchase and Sale Agreement entered into with the W. O. Brisben Companies ("Brisben"), began an intensive discovery campaign against many of the Creditors in this case, including serving notices of deposition, subpoenas duces tecum and taking depositions at significant cost and expense, and simultaneously agreeing that the Debtor's Creditor, Vigeant, could be relieved from the automatic stay so that he  could commence foreclosure proceedings against the Debtor's Project as the Brisben transaction collapsed as the Debtor and its principals predicted that it would.   Although the Proponent expected that the Trustee would support the Proponent's Plan, he has not joined with the Proponent to date, perhaps in the hope that Brisben which continues to hold "meetings" with the Hudson, New Hampshire selectmen and its Planning Board with his tacit approval despite the expiration of its contract will buy the Project.

**3.4   Expected Post-Confirmation Operations.**

**3.4.1. Creation of Condominium; Phases.** Within 30 days from the date on which the Court approves this Disclosure Statement, the Proponent will file an application with the Office of the Attorney General requesting it to approve and register the Project as a Condominium consisting of various Phases or villages consisting of approximately 50 Units subject to existing topographical conditions (the "Phases" or "Villages"). The Proponent expects to receive approval within 60 days of the date on which it files the application. Other parties believe that it may take as long as 90 days . Assuming that the Proponent is correct, sales should begin closing during September and October, 2000.

**3.4.2. Estimated Sale Price and Costs.** In general, the Proponent believes that the minimum sale price of $140,000 per unit. The Proponent expects that the cost of construction, including infrastructure will be $100,000 per unit on average or less. Based on the Proponent's experience, it expects to sell the Project out within 3 years from the Effective Date although it cannot guarantee that it will.

**3.4.3. Resolution of Site Plan Approval Issues.** Throughout this Case, issues have been raised regarding the effect of the passage of time on the Debtor's Development Permits. The Proponent believes that its Development Permits issued by Hudson are, and will continue to be in full force and effect and vested through  at least October 28, 2000. It is possible that, after October 28, 2000, the Proponent will have to pay increased impact fees amounting to an estimated $500,000 which have been factored into the Proponent's internal, feasibility analysis and might become subject to the existing soils and slopes ordinance. Richard Maynard, the civil engineer

responsible for the design of the Project, has expressed the opinion that the soils and slopes ordinance does not adversely affect the Project as currently permitted by the Town.  Assuming that litigation with Hudson should become necessary which the Proponents doubts, the Proponent will file within 90 days following Confirmation (or such later date as the Court may permit) an adversary proceeding seeking a declaratory ruling that the Development Permits are valid and enforceable and will continue to be valid and enforceable and immune from changes in the zoning ordinance and site plan, subdivision and other regulations through October 28, 2000 and will continue to be fully vested into the future on a variety of legal theories, including estoppel, tolling, the need to avoid an unconstitutional  taking, the fact that the Reorganized Debtor will have done substantial work in accordance with the  Plan and the decision of the New Hampshire Supreme Court in *Piper v. Meredith.*

At a more practical level, the Proponent will attempt to negotiate a mutually satisfactory resolution of the issued raised by Hudson with it.  The Proponent would prefer to develop the Project as a middle to upper-income, predominantly empty-nest community consisting of approximately 400 units and intends to seek approval of such a plan if the parties' discussions indicate that Hudson would be receptive to such a plan (the "Modified Development Proposal").  It believes that such a Project would accommodate Hudson's concerns without sacrificing the economic viability of the Project.  The submission and approval of the Modified Development Proposal should not delay the construction of the Loop Road Infrastructure, the submission of the Condominium Application or the construction of the first 50 Units.  Should Hudson not

approve the Modified Development Proposal, the Proponent will build the Project as permitted at the present time.

## 4.0  PLAN CLASSES; IMPAIRMENT AND GENERALLY APPLICABLE PROVISIONS

**4.1   Duty to Designate Plan Classes; Impairment and Voting.**  Under the Code, a plan must "designate, subject to [S]ection 1122 of this title, classes of claims, other than" administrative and tax Claims entitled to priority under Section "507(a)(1), (2) and (8)". "A plan may place a [C]laim or [I]nterest in particular class only if" it "is substantially similar to the other[s]" in the class" although Section 1122 specifically sanctions the creation of a "separate class of unsecured claims consisting only of" those that are "less than or reduced to an amount that the" Court "approves as being reasonable and necessary for administrative convenience".  Under Section 1124, a Class is unimpaired if the plan "leaves unaltered the legal, equitable and contractual rights of" each holder of a "claim or interest" in the Class, except for providing for the "cure" of Pre-Petition and Post-Petition defaults or "reinstates the maturity" of such claim or interest" and compensating the holder . . . for any damage incurred as a result of any reasonable reliance . . . on a contractual provision or . . . law.  Under the Code, Creditors in Unimpaired Classes are deemed to have accepted the Plan and may not vote on it or object to it.

**4.2   Identification of Classes; Impairment and Voting.**  As required by Section 1123, the Plan divides the Debtor's Creditors into the following Unclassified and Classified Claims Classes:

**4.2.1. Unclassified Claims Classes.**  Only the Administrative Claims Class will

be an Unclassified Class under the Plan. This "Class" or group has been created solely for disclosure and accounting purposes since Section 1123 of the Bankruptcy Code excludes "claims of a kind specified in Section 507(a)(1), (2) and (8) from being included in a Class. Each Claim in this Class must, however, be disclosed, accounted for, and paid as part of the reorganization process. Notwithstanding the "classification" of these Claims, Creditors asserting Claims in this Class may not vote on the Plan.

**4.2.2. Classified Claims Classes.** The Plan will create the following Classes of Classified Creditors and Claims:

      A.      Class 1 - Real Estate Tax Claim Class.

      B.      Class 2 - Secured Claims Class.

      C.      Class 3 - Senior Unsecured Claims Class.

      D.      Class 4 - Junior Unsecured Claims Class.

      E.      Class 5 - Subordinate Claim Class.

      F.      Class 6 - Equity Interest Holders Class.

**4.2.3. Impaired, Voting Classified Claims Classes.** All Classes will be impaired by the Confirmation of the Plan and have the right to vote on it subject to the further provisions of this Disclosure Statement governing the voting of Contested Claims, if any.

**4.3 Provisions Applicable to All Secured Claims.**

**4.3.1. Retention of Liens.** All Creditors whose Claims are treated as secured in the Plan shall retain their liens on the collateral securing their respective Claims until such Claims are paid in full in the amount allowed as secured.

**4.3.2. Modification of Liens.** All Creditors holding Allowed Secured Claims shall

be required to execute and deliver Partial Discharges of Mortgage or Partial Discharges

of Lien on the payment to any one or more of them of an amount equal to $20,000 for

each Unit Site to be released (the "Partial Discharge Payment") irrespective of whether

or not any such Creditor actually receives any part of such Payment or Payments.

Except as modified by the terms of the Plan, all documents evidencing indebtedness

and security in favor of each secured Creditors will remain in full force and effect.

Following Confirmation, the Plan and the Confirmation Order may be recorded and shall

constitute a modification of the terms and condition of said instruments as set forth

herein.

## 4.4   Provisions Applicable to All Classes.

### 4.4.1.  No Dividends to Junior Classes Until Senior Classes Paid in Full.

Under no circumstances shall a Creditor holding an Allowed Claim in any Class be paid

or entitled to receive any Dividend until such time as Creditors holding Allowed Claims in

Senior Classes shall have been paid the Dividends due them in full, except for the

Minimum Combat Payment and Minimum Unsecured Creditors Payment becoming due

under the Plan.  When used in reference to a Class of Claims or equity interests, the

terms "senior" and "junior" means those Classes with a lower or higher number than the

subject Class, as appropriate.  For example, a Class designated "4" would be senior to

a Class designated "5" and junior to a Class numbered "1".

### 4.4.2.  Absence of Certain Disclosures.  The Proponent will disclose:  (i) any

known disputes which would have the effect of increasing or decreasing the estimated or

projected amount of Allowed Claims in any Class by more than 10% (a "Material

Dispute'), and (ii) any factors which might reasonably be expected to reduce the amount of any Projected Dividend by more than 10% ("Material Dilution").  In the absence of disclosures regarding Material Disputes or potential Material Dilution, Creditors may assume that the Proponent does not know of any Material Disputes or potential Material Dilution.  Irrespective of the amount involved in any Accounting Dispute, no Accounting Dispute shall be deemed to be a Material Dispute.

**4.4.3. Creditors May Accept Less Favorable Treatment.**  Nothing contained in the Plan shall prevent or be deemed to prevent any Allowed Creditor from accepting less favorable treatment than might be required by the Code or available under the terms of the Plan.

**4.4.4. Proofs of Claim and Fee Applications.**

A.      Any Creditors which held or asserted Claims against the Debtor which were listed as being contingent, disputed or unliquidated in the Debtor's Schedules and failed to file Proofs of Claim by the Bar Date shall not receive any Dividend on account of such Claims.

B.      All Professionals holding Administrative Claims against the Debtor must file a written Notice of Estimated Administrative Claim with Edmond J. Ford, Esquire, Trustee at least 5 days before the Confirmation Hearing which shall be accompanied by a detailed statement describing the services rendered to the Estate and a statement of the Professional's intention to request a bonus or premium.  Within 30 days after the Confirmation Date, final applications for compensation must be filed pursuant to Section 330 unless the Court enters an order extending such date.

**4.4.5. Contested Claims.**  All Claims shall be subject to the procedures established by the Plan for resolving contested or disputed Claims ("Contested Claims"). The Trustee objected to many of the Claims asserted by major Creditors in this Case (the "Claims Objection").  All of the Objections to Claims filed by the Trustee have been resolved with the exception of those pertaining to the Claims of Vigeant which the Court has under advisement and those asserted by Platinum and Dawn Balzotti (the "Platinum Objection" and "Balzotti Objection").  Under the Plan, the Balzotti and Platinum Objections will be withdrawn with prejudice since the Creditors  have agreed to subordinate their Claims to those of all of the other Creditors in this Case except Robert Quirk making an objection irrelevant.

**4.4.6.  No Effect of Co-Debtor Liabilities; Subrogation.**

A.     Nothing contained in the Plan or the Confirmation Order shall adversely affect, limit or adversely affect the privileges, remedies and rights which any Creditor holds against any Co-Debtor or responsible person within the meaning of IRS' regulations (collectively, "Co-Debtors") or constitutes an admission of liability or the amount of damages for which any such Co-Debtor may be liable.

B.     If, and to the extent that any Co-Debtor makes any payment, whether it in cash or otherwise, to a Creditor holding an Allowed Claim against the Reorganized Debtor, such Co-Debtor shall be automatically and fully subrogated to the privileges, remedies and rights held by such Creditor on a pari passu basis.

## 5.0  UNCLASSIFIED CLAIMS CLASSES

## 5.1   Administrative Claims Class.

**5.1.1. Class Definition.** This Class consists of all Claims asserted against the Debtor by Creditors which are entitled to a priority under Section 507(a)(1).

**5.1.2. Proposed Treatment.** On the later of the Effective Date or the Allowance Date of any Claim in this Class, the Reorganized Debtor shall pay each Allowed Claim in this Class in full from the Confirmation Deposit, including the post-petition Real Estate Tax Claim asserted by Hudson and the quarterly fees due the U.S. Trustee.

**5.1.3. Additional Information Regarding Class and Estimated Dividend.**

A.      Included in this Class will be the Claim asserted or expected to be asserted against the Debtor by: (i) the Trustee in the amount of $60,000, including Sheehan, Phinney, Bass + Green; and (ii) Notinger in the amount of $40,000.

B.      The Proponent reserves the right to object to any Claim in this Class.

**5.1.4. Projected Dividend.** The Proponent expects to pay, and has included in the Projections the payment of a Dividend of: (i) $60,000 or less to the Trustee and Sheehan, Phinney, Bass + Green; and (ii) $40,000 to Notinger.

## 6.0 CLASSIFIED CLAIMS CLASSES

**6.1   Class 1 - Real Estate Tax Claim Class.**

**6.1.1. Plan Definition.** This Class consists of the Secured Claim asserted against the Debtor by the Town of Hudson, New Hampshire (the "Local Government" or "Hudson") for unpaid real estate taxes assessed against the Real Estate to the extent secured by the statutory Lien on such Real Estate which arose and exists pursuant to RSA 80:19 (the (the "Real Estate Tax Claim" and the "Real Estate Tax Lien"). The Town of Hudson will be paid in full, or almost in full from the Confirmation Deposit

unless the Court should allow more than $125,000 in Administrative Claims, an unlikely event in the Proponent's opinion.

**6.1.2. Treatment.** On Final Confirmation, the Real Estate Tax Claim will be automatically allowed in the full amount of the real estate taxes assessed by Hudson, with interest at the rate of 9% during the term of this Case, by the entry of the Final Confirmation Order whether or not such Order shall refer specifically to such Claim (the "Allowed Real Estate Tax Claim"). The Reorganized Debtor shall pay the Real Estate Tax Claim as follows:

A. On the Effective Date, the Reorganized Debtor shall pay to the Local Government an amount equal to the lesser of (i) the amount of the Allowed Real Estate Tax Claim or (ii) an amount equal to the remainder of the Confirmation Deposit (the "Hudson Cash Confirmation Dividend") which shall be applied to such Real Estate Taxes in the order of their assessment.

B. If the Hudson Cash Confirmation Dividend shall not be sufficient to pay Hudson's Allowed Claims in full, the deficiency shall be paid in such number of consecutive, blended monthly installments of principal, plus interest at the rate of 9% per annum, as may be necessary to pay such Claim in full over a period of 72 months, less the number of months which shall have elapsed since the date of the earliest, unpaid assessment from the Reorganized Debtor's Distributable Loan Proceeds.

**6.1.3. Retention of Lien and Collateral.** Hudson will retain its Lien securing the payment of the real estate taxes due it subject to the provisions of: (a) Paragraph 4.3, (b) the reduction of its interest rate; and (c) as may be necessary to reflect the treatment

of the Allowed Claims in this Class and implement the Plan.

**6.1.4. Included Claims; Class Amounts and Known Disputes, if any.** This Class consists of the Secured Claim asserted against the Debtor by the Town of Hudson, New Hampshire in the amount of $156,000.

**6.1.5. Expected Dividend.** The Debtor estimates that the Creditor in this Class will receive a Dividend of $156,000, plus interest at the Class Interest Rate, over the term of the Plan.

**6.2 Class 2 - Secured Claims Class.**

**6.2.1. Plan Definition.** This Class consists of all Secured Claim asserted against the Debtor to the extent allowed as Secured Claims. Included in this Class are the Secured Claims asserted by:

A. Vigeant for principal, interest and other sums due under the terms of the Vigeant Loan Documents in the amount allowed by the Court in its decision on the Trustee's Objection to such Claim or such other amount as may be mutually acceptable to the parties (the "Vigeant Secured Claim" or "Class 1-A Claim"); and

B. Combat for infrastructure and other sitework done on the Real Estate and labor, materials and services furnished in connection with such work in the amount of $92,000 (the "Combat Secured Claim" or the "Class 1-B Claim"). Under the terms of the Plan, the balance of Combat's Claim in the approximate amount of $65,000 will be treated as a Class 4 Claim.

**6.2.2. Treatment.**

A. Any portion of the Confirmation Deposit remaining after the

Reorganized Debtor shall have paid the Allowed Administrative and Real Estate Tax Claims held by Administrative Creditors and Hudson shall be paid to Vigeant in reduction of the principal balance of his Allowed Secured Claim, as ultimately determined by this Court (the "Vigeant Confirmation Payment").

B.     After the Class 1 Creditor has been paid in full, the Reorganized Debtor shall pay over all of its Distributable Loan Proceeds within 5 business days of receiving such Proceeds to: (a) Vigeant until such time as his Class 1-A Claim has been paid in full, with interest at the rate of 8%; and then (b) Combat until such time as its Class 1-B Claim has been paid in full, with interest at the federal judgment interest rate (the "Class Interest Rates").   .

C.     Notwithstanding any other provision of the Plan, the Allowed Secured Claims will be paid in full on or before the day preceding the 5th anniversary of the Effective Date.

**6.2.3. Retention of Mortgage, Lien and Collateral.** The Secured Creditors will retain their Mortgage and Lien securing the payment of the Allowed Claims in this Class subject to the provisions of: (a) Paragraph 4.3, (b) the reduction of Vigeant's interest rate; and (c) as may be necessary to reflect the treatment of the Allowed Claims in this Class and implement the Plan.

**6.2.4. Participation in Net Recoveries.**  In addition to the Partial Discharge Payments to be made by the Reorganized Debtor, the Allowed Secured Creditors may receive extraordinary Dividends from any Net Recoveries made by the Reorganized Debtor or the RAD Plaintiffs in any Litigation as more particularly described in the Plan.

If and to the extent that Vigeant or Combat shall be paid any Net Recoveries made in the RAD Litigation, any portion of their Allowed Secured Claim assigned to the RAD Plaintiffs shall be subordinated to balance of such Claim held by such Creditor for Dividend payment purposes.

**6.2.5. Expected Dividend.** The Debtor estimates that the Creditors in this Class will receive a Dividend equal to the amount of his Allowed Secured Claim, plus interest at their Class Interest Rates, over the term of the Plan.

**6.3   Class 3 - Senior Unsecured Claims Class.**

**6.3.1. Plan Definition.** This Class consists of all Unsecured Claims without Priority asserted against the Debtor (the "Senior Unsecured Creditors"), except for those specifically included in the Subordinate Cash Flow Claims Class and Participating Claims Class.

**6.3.2. Treatment.**

A.      After Class 1 and 2 Creditors holding Allowed Claims have been paid in full, the Reorganized Debtor shall pay over to the Agent all or the remaining portion of any Distributable Loan Proceeds received by the Reorganized Debtor within 5 business days of receiving them until such time as all Allowed Claims in this Class shall have been paid in full.

B.      In order to insure that the Reorganized Debtor does not sell the Project in order to avoid satisfying its obligations under the Plan, the Reorganized Debtor will enter a Negative Pledge Agreement with the Agent for the benefit of this Class which shall, among other things, include a provision requiring the Agent to

provide lenders with such agreements and documents as may be reasonably requested to assure any such lender that any Mortgage of all, or any portion of the Real Estate granted to the lender will be senior and superior to the Negative Pledge Agreement and the Claims held by the Agent in all respects.

**6.3.3. Included Claims; Class Amounts; Known Disputes.** Included in this Class are Combat, Pamela Dritt, Paul Davies & Associates, Sherin & Lodgen, the Architectural Team, Gilman, McLaughlin, Maine Blasting, Maynard & Paquette Engineering, Gottesman & Hollis, Kurz Environmental, Walter & Shuffain, PC and Peluso Estimating Services which amount to $1,090,915 in the aggregate. The Proponent intends to contest or dispute the following Claims in this Class on grounds other than Accounting Disputes:

A.      Maine Drilling and Blasting.

As a result, the Proponent projects the Allowed Amount of Claims in this Class to be $1,030,000.

**6.3.4. Expected Dividend.** The Debtor expects to pay Creditors holding Allowed Claims in this Class $1,030,000.

**6.3.5. Potential Dilution.** Slow absorption of Units or Unit Sites or falling market prices for Unit Sites might dilute the Dividend to be paid Creditors holding Allowed Claims in this Class although the Proponent believes that possibility of dilution is remote.

**6.4   Class 4 - Junior Unsecured Claims Class.**

**6.4.1. Plan Definition.**    This Class consists of the Claims held by the following Creditors:  Dawn Balzotti, and Robert Quirk (the "Junior Unsecured Creditors").

**6.4.2. Treatment.** After Class 1, 2 and 3 Creditors holding Allowed Claims have been paid in full, the Reorganized Debtor shall pay over to the Agent all or the remaining portion of any Distributable Loan Proceeds received by the Reorganized Debtor within 5 business days of receiving them until such time as all Allowed Claims in this Class shall have been paid in full.

**6.4.3. Included Claims; Class Amounts and Known Disputes, if any.** This Class consists of the Claims held by Dawn Balzotti, and Robert Quirk in the aggregate amount of $1,000,000.

**6.4.4. Expected Dividend.** The Debtor estimates that the Creditors in this Class will receive a Dividend of $1,000,000 over the term of the Plan.

**6.4.5. Potential Dilution.** Slow absorption of Units or Unit Sites or falling market prices for Unit Sites might dilute the Dividend to be paid Creditors holding Allowed Claims in this Class although the Proponent believes that possibility of dilution is improbable.

**6.5   Class 5 - Subordinate Claim Class.**

**6.5.1. Plan Definition.** The only Creditor included in this Class is Platinum Construction.

**6.5.2. Treatment.** After Class 1, 2, 3 and 4 Creditors holding Allowed Claims have been paid in full, the Reorganized Debtor shall pay over to the Agent all or the remaining portion of any Distributable Loan Proceeds received by the Reorganized Debtor within 5 business days of receiving them until such time as all Allowed Claims in this Class shall have been paid in full.

**6.5.3. Included Claims; Class Amounts and Known Disputes, if any.**  The only Creditor included in this Class is Platinum Construction in the amount of $1,900,000.

**6.5.4. Expected Dividend.**   The Debtor estimates that the Creditor in this Class will receive a Dividend of $1,944,717 over the term of the Plan.

**6.6   Class 6 - Equity Interest Holders Class.**

**6.6.1. Plan Definition.**  This Class consists of the Debtor's Equity Holders of record and all persons claiming by, through or under them.

**6.6.2. Treatment.** On the Effective Date, all of the membership interests held by the Debtor's Equity Holders shall be canceled automatically by the entry of the Final Confirmation Order.

**6.7   Expected Plan Dividend Table.**  The following Table summarizes the distributions which the Debtor expects to pay Creditors under the Plan over its term based on the Estimated Amount of Allowed Claims in each Class:

| PROJECTED PLAN DIVIDENDS | | | | | |
|---|---|---|---|---|---|
| | | | | Deferred | |
| UNCLASSIFIED CLASSES | | Est. All. Claims | Conf. Div. | Div. [Ex. Int.] | Total Div. |
| | Administrative Claims Class | $100,000 | $100,000 | $0 | $100,000 |
| | | | | | |
| **CLASSIFIED CLASSES** | | | | | |
| 1 | Real Estate Tax Claim Class | $200,000 | $200,000 | $0 | $200,000 |
| 2 | Secured Claims Class | $3,400,000 | $0 | $3,400,000 | $3,400,000 |
| 3 | Senior Unsecured Claims Class | $1,090,000 | $0 | $1,090,000 | $1,090,000 |
| 4 | Junior Unsecured Claims Class | $1,000,000 | $0 | $1,000,000 | $1,000,000 |
| 5 | Subordinate Claim Class | $1,900,000 | $0 | $1,900,000 | $1,900,000 |
| 6 | Equity Interest Holders Class | $0 | $0 | $0 | $0 |
| | | $7,690,000 | $300,000 | $7,390,000 | $7,690,000 |
| | | | | | |
| **NOTES:** | | | | | |
| | Assumes that 400 Units are built and sold by Reorganized Debtor | | | | |
| | | | | | |
| | | | | | |

# 7.0 REMAINING PROPERTY; REORGANIZATION AND LIQUIDATION VALUES

## 7.1   Remaining Property and Related Definitions.

### 7.1.1.  Remaining Property.  As used in this Disclosure Statement, the term

"Remaining Property" means and includes the Development Property and all of the

other Property which the Debtor owns, or in which the Debtor holds an interest on the

Disclosure Date other than any Property which is the subject of an Approved Pre-

Confirmation Transaction.  For the purposes of this Disclosure Statement, the

Proponent assumes that each Approved Confirmation Transaction will close in

accordance with its terms.

### 7.1.2.  Related Definitions.

A.       "Liquidation Value" means with respect to any Property of the

Estate, the amount which the Debtor would receive from a hypothetical foreclosure sale

conducted in full conformity with New Hampshire law, less any costs and expenses

which would be necessarily or reasonably incurred in connection with such sale.

B.      "Reorganization Value", when used in relation to: (I) Real Property, its fair market value; (ii) Personal Property used in connection with an on-going business, its going concern value; (iii) Personal Property which is not used or being used in connection with an on-going business, its fair market value in a bona fide arm's length sale.

C.      "Significant Property" or "Significant Asset" means Property which alone or as part of a category or group of assets has a Reorganization Value of $1,000 or more without deduction for any amount secured or allegedly secured by any Lien on such Property.

**7.2   Valuation Principles and Assumptions.**

**7.2.1. Reorganization Values.**  Except as otherwise provided for herein, the Proponent has established the Reorganization Values attributed to the Debtor's Property as follows:

A.      The Proponent has relied on the opinions expressed by competent, qualified experts during the course of hearings on this Case, including the value opinion expressed by Robert E. Richard.

B.      The Proponent considered each and every available appraisal of the Property, including those done by Robert G. Bramley, MAI, and weighed them against its own opinion and the opinions of other experts.

C.      In the absence of an appraisal or experts' opinions, the Proponent has relied on its own expertise and the information provided by the Debtor.

**7.2.2. Liquidation Assumptions.**  In general, the Debtor made or used the following assumptions in reducing the Reorganization Value attributed to any significant Property to its projected Liquidation Value:

A.     The liquidation would begin on June 1, 2000  and be completed within 60 days.

B.     In the absence of a confirmed Reorganization Plan, this case would be converted to a Chapter 7 Liquidation Case.  The United States Trustee would appoint a trustee who would not oppose motions seeking relief from the automatic stay.  To the extent that the Trustee liquidated any unencumbered Property, the Court would allow the Trustee the maximum statutory fee permitted by the application of the sliding, percentage fee scale set forth in Section 326.

C.     All foreclosure proceedings and other actions taken to liquidate the Debtor's property would be conducted in a commercially reasonable manner and in full conformity with New Hampshire law and would result in the payment of commercially reasonable prices, but in no event less than the liquidation values given for the Debtor's Property in the Article captioned "Significant Assets and Values" would prove to be accurate.

**7.3   Significant Remaining Assets; Record Liens and Values**.

**7.3.1. Real Estate.**  The Debtor owns the Real Estate which consists of approximately 68.01 acres of approved and partially improved land located on Bush Hill Road in Hudson, New Hampshire.  The Debtor valued the Real Estate at $7,500,000 based largely on the $7,500,000 "as is fair market value" established by Robert G.

Bramley in the appraisal which he did for Advisco Capital Corporation during October, 1998 (the "1998 Bramley Appraisal"). On March 17, 2000, Bramley testified that the fair value of the Real Estate, including the Development Permits has risen to $8,200,000, but then discounted the value to $4,100,000 to reflect the unquantified, potential effect of Hudson's soils and slopes ordinance, a projected $500,000 increase in the Impact Fees and other "unknowns" which include potential, but unidentifiable changes in Hudson's zoning ordinance and site plan and subdivision regulations. In the Proponent's view, the Real Estate, with the Development Permits, has a reorganization value of $6,800,000 in a cash transaction or $11,500,000 or more in a transaction funded as contemplated by the Plan as Robert E. Richard testified on or about March 14, 2000. For the purposes of this Disclosure Statement, the Proponent adopts the deferred payment value of $8,000,000 which is between the values to which Richard and Bramley have testified during this Case and a liquidation value of $2,800,000 based on Bramley's opinion because in a liquidation the development time frame becomes unpredictable.

**7.3.2. General Intangibles.** The Debtor's general intangibles include its Development Permits and the drawings, plans and specifications relating to the construction of the Project, but have been valued with the Real Estate for the purposes of this Disclosure Statement.

**7.3.3. Actions.** The Proponent believes that the Debtor may have Causes of Action against Vigeant and Credit Suisse based on its breach of the loan commitment made to the Debtor although the defenses of impracticability or impossibility may be

available to it.  The Proponent is not aware of any Bankruptcy Actions other than (a) the

Claims Objections filed by the Trustee (the "Trustee's Objections") and (b) the other

Bankruptcy Actions which he has suggested may exist against Platinum and members of

the Balzotti family.  Under the terms of the Plan, all Actions which the Estate may have

against Platinum or any member of the Balzotti Family will be compromised and settled

in consideration of their subordination of their Claims to those held by other Creditors

holding Allowed Claims and the assignment of Net Recoveries in the RAD Litigation to

the Agent.

**7.4   Reorganization and Liquidation Value Summary.** The following Table

summarizes the Proponent's conclusions regarding the Reorganization and Liquidation

Values of the Debtor's Significant Remaining Property:

| REORGANIZATION AND LIQUIDATION VALUES OF REMAINING, SIGNIFICANT PROP | | |
|---|---|---|
| | Reorg. Value | Liq. Value |
| **Development Property** | 8,000,000 | 2,800,000 |
| | | |
| | | |
| Notes: | | |
| Values Real Estate Development Permits and Plan as entirety in the absence of appraisal | | |
| or expert testimony valuing each component | | |

## 8.0   COMPARISON OF HYPOTHETICAL LIQUIDATION, PLAN
## AND ANY OTHER ALTERNATIVES

**8.1   No Realistic Alternative.** Under the rather unique facts of this Case, there is no

viable realistic alternative to the Plan for any Creditors other than Vigeant.  The W.O.

Brisben Companies offered to purchase the Debtor's Real Estate for $4,105,000

subject to the satisfaction of a number of undefined and unquantifiable contingencies, including its obtaining satisfactory modifications to the Development Permits. Brisben created a storm of controversy by filing an Application which made it clear that Brisben would develop affordable or low-income housing using funds provided by the New Hampshire Housing Finance Authority ("NHFA"). On March 17, 2000, Brisben withdrew its NHFA Application during the hearing on the Motion to Vacate Sale Order. It subsequently allowed its Purchase Contract to expire because it would not risk the $50,000 deposit. Nevertheless, Brisben continues to jeopardize the Development Permits by holding public meetings with NHFA and private meetings with the Hudson selectmen and its Planning Board without having any interest in the real estate at this time. Given the critical importance of the Development Permits to the funding and implementation of the Plan, the Proponent may ask the Trustee to file a Complaint against Brisben and others seeking an injunction preventing them from entering into discussions or negotiations with Hudson and its representatives regarding the permits.

During the term of this Case, the Debtor, acting through its Managing Member and Caesar Balzotti, tried to find a buyer for the Project or a lender or a joint venture partner with which it could complete the Project. The Debtor did not know that the parallel marketing effort conducted by the Debtor's Broker included a mistaken, public announcement that the Court had entered an order in the Debtor's Bankruptcy Case requiring a sale of the Real Estate. The Debtor received many expressions of interest at amounts in excess of $8,000,000, but not surprisingly could not close any of the proposed transactions prior to the Court's approval of the Brisben offer. The Debtor's

Broker also perpetuated and spread Vigeant's mistaken, but often expressed view that the Development Permits were "scheduled to expire on October 28, 2000". Given the amount of uncertainty which has been created with respect to the viability of the Project, the Proponent believes that it is unlikely that any other person will offer even as much as it proposed to pay Creditors holding Allowed Claims through the Plan without imposing numerous, open-ended conditions and contingencies which do not exist in the Development Agreement.

**8.2 Liquidation Alternative.**

**8.2.1. Hypothetical Liquidation.** In an effort to provide creditors and equity holders with a benchmark against which to measure the Plan, the Debtor created the hypothetical chapter 7 liquidation described in this Section relying on the liquidation assumptions set forth in the Section captioned "Liquidation Assumptions" and those described in this Section. A liquidation sale of the Development Property would likely produce not more than 70% of Bramley's discounted, fair market, as is value of $4,100,000. The $2,850,000 which Vigeant or a trustee might realize would be further reduced by costs and expenses of sale which Vigeant has estimated at $100,000 in the past. Assuming a net recovery of $2,700,000, the Trustee or Vigeant would pay the Hudson Allowed Secured Claim in full and then pay over the estimated $2,550,000 balance to Vigeant in partial satisfaction of his Allowed Secured Claim. In a liquidation Allowed Administrative Claims would not be paid.

**8.2.2. Liquidation Distribution Table.** The following Table summarizes the Debtor's conclusions regarding the results of the hypothetical liquidation of the Debtor's

Property:

| PROJECTED LIQUIDATION DISTRIBUTION | | | | |
|---|---|---|---|---|
| | | Creditor | Claim or | |
| **Encumbered Pre-Petition Property** | **Liq. Val.** | **or Exemption** | **Exemp. Amt.** | **Distribution** |
| Development Property | $2,800,000 | Hudson | $200,000 | $200,000 |
| | $2,600,000 | Admin. Claims | $100,000 | $300,000 |
| | $2,300,000 | Vigeant | $3,011,000 | $2,300,000 |
| | | | | |
| **Deficiency Classes** | **Lost Amt.** | | | |
| Secured Claims Class | $900,000 | | | |
| | | | | |
| **No Dividend Classes** | | | | |
| Senior Unsecured Claims Class | $1,090,000 | | | |
| Junior Unsecured Claims Class | $1,000,000 | | | |
| Subordinate Claim Class | $1,900,000 | | | |
| Equity Interest Holders Class | $0 | | | |
| | | | | |
| **Total Lost Amount** | $4,890,000 | | | |
| | | | | |
| | | | | |
| | | | | |

### 8.3  Confirmation of Plan is in Best Interests of Creditors as a Whole.

Confirmation of the Plan is in the best interests of Creditors as a whole.  Richard and

Bramley testified that at least 50 units could be built before October 28, 2000.  A Table

projecting the Dividends which would be paid from the First Phase Loan and subsequent

Phases consisting of an additional 50 Units each to a total of 250 Units.  The Plan will

result in the payment of $1,000,000 in Dividends even if no more than 50 Units are ever

built on the Real Estate by the Proponent (the "Minimum Projected Dividends").  Vigeant

will receive approximately $1,000,000 from the first Phase Closing and retain his

mortgage on 350 Units which should be worth a minimum of $5,250,000 as security for a

Claim which should not exceed $2,200,000.  Even if only 200 Units are built, all

Creditors holding Allowed Claims will be paid in full with the exception of Hudson which will continue to hold a first Lien on the Real Estate and Platinum which has agreed to leave its money on the table.

While the Proponent concedes that the Disclosure Statement does not disclose "any basis for making a net present value calculation for the payments made to any of the secured claimants", the Proponent does not believe that doing so is necessary. Creditors holding Allowed Secured Claims will be paid interest on them at the rate of 8% per annum pursuant to the Plan. If, and to the extent that Allowed Secured Claims are not paid in full within 5 years from the Effective Date, the Secured Creditors may foreclose their mortgage and lien and may then be permitted under state law.

### 9.0 IMPLEMENTATION OF PLAN

**9.1   Plan Transactions.** On the Effective Date, the Reorganized Debtor will consummate or close the transactions contemplated by the Development Agreement.

**9.2   New Management.** Following Confirmation, the Reorganized Debtor will be managed by Ralph Caruso irrespective of whether or not he becomes a member of the Reorganized Debtor.

**9.3   Implementation Pursuant to Plan.** In addition to the Transactions discussed in this Disclosure Statement, the Plan will be implemented as described in Article 5 of the Plan which is incorporated herein by reference as fully as if reprinted in its entirety.

**9.4   Retention of Causes of Action Pursuant to Section 1123.** The Reorganized Debtor will retain any and all Causes of Action, including those against Vigeant and Credit Suisse. Any Net Recoveries will be disbursed as if they were Net Proceeds.

Although the Reorganized Debtor will also retain any Bankruptcy Actions, the Trustee will be left free to prosecute them if he wishes to do so.

**9.5   No Unexpired Real Estate Leases.**   The Debtor is not a party to any unexpired leases of real estate ("Leases").

**9.6   Assumed Executory Contracts.**   To the extent that the Debtor's Development Permits constitute Executory Contracts, the Debtor will assume them on the Effective Date (the "Assumed Executory Contracts").   The Debtor is not in default.   Consequently, no cure payments will have to be made by the Debtor in order to assume the Assumed Executory Contracts.

**9.7   All Other Executory Contracts and Leases to be Rejected.**   At present, the Debtor intends to reject all of its Executory Contracts and Leases others than those described as "Assumed Contracts" or "Assumed Leases" in the preceding Section or as otherwise shall be expressly allowed under the Plan.   The rejection of an Executory Contract or Lease will give the other party to it a Rejection Claim.   At the Confirmation Hearing, the Debtor may seek permission to assume one or more of the Rejected Contracts or Leases, but shall be deemed to have done so only if the Confirmation Order specifically authorizes the assumption of one or more of them.

### 10.0   RISK FACTORS AND FEASIBILITY.

**10.1 Risk Factors.**

    **10.1.1.**   **Risk Imposed by Confirmation in General.**   Confirmation of the Plan exposes Creditors to two different risks.   Creditors may not receive all of the Dividends promised by the Plan.   Confirmation followed by a liquidation might even

dilute potential recoveries through the Hypothetical Liquidation if the real estate market were to decline precipitously and remain depressed for an extended period of time. Creditors should In consider the specific risk factors and feasibility issues described in this Section and weigh the promised Dividend against the amount which they might recover in a liquidation. Although the Plan clearly offers Creditors holding Allowed Claims far more than they would receive in a Hypothetical Liquidation.

**10.1.2.**  **Macro Economic Risks.**  In general, macro economic risks are those that affect the economy or segment of the economy as a whole, as opposed to those which affect a Debtor's business.  The strong economy shows no sign of weakening within the immediate future in the Property in the opinion of Richard and Bramley, who testified that the Real Estate has actually increased in value over the term of this Case except for the uncertainties resulting from the "unknown risks" which may affect the development of the Real Estate in the future.  Consequently, the Proponent doubts that there are macro economic risks which should be a concern to Recipients which would affect their Minimum Projected Dividend.

**10.1.3.**  **Management Risk.**  Even if all other risks in any transaction can be eliminated or discounted, there is always the risk that management will not be able to meet its goals and objectives.  The Reorganized Debtor will be comprised of the Proponent and, perhaps, others.  Neither Anthony Balzotti nor Dawn Balzotti will be a member of the Reorganized Debtor.  Apparently, Pamela Dritt, a Creditor, equity holder and fiduciary, wants the Proponent to disclose the fact that she may object to the Plan at  confirmation based on *203 North LaSalle Street* and other grounds.

Given the financial strength of the members of the Reorganized Debtor, there is little doubt that the Reorganized Debtor will be able to finance the construction of the infrastructure and the first 50 units.  CJC, LLC and Thibeault Corporation of New England have sufficient  cash available to them to pay the costs and expenses of constructing the infrastructure.  Further, CJC, LLC can lend the Debtor sufficient funds to pay the Partial Release Payment which will become due Vigeant under the Plan. The Development Contractor will be a New Hampshire limited liability company of which Balzotti, Caruso and Ernest Thibeault and/or their nominees will be members.  All of the members of the Development Contractor have extensive experience in building residential units and Project infrastructure.  At the Confirmation hearing, the Proponents will provide exhibits summarizing their experience and qualifications.  Attached are copies of the financial statements of CJC, LLC and Thibeault Corporation which are the entities which will be responsible for the construction of the infrastructure and the first 50 units in the Project.  The Proponent is working on the total construction budget for the Project as currently approved by Hudson and the other Governmental Authorities. At confirmation, a final budget will be provided to establish that the Plan is "feasible".

**10.1.4.     Feasibility.**  Assuming that the Court approves a Motion for Permission to Incur Secured Debt to Finance Infrastructure Completion which will be filed if, but only if Vigeant consents to the granting of the requested relief,  Caruso or his nominee will have substantially improved the Real Estate by constructing the so-called Loop Road at a cost of approximately  $2,000,000 prior to Confirmation.  Coupled with the virtually complete subordination of the Subordinate Cash Flow Creditors Claims and

the total subordination of the Claim held by Platinum, almost $5,000,000 has been turned into "quasi-equity" at least from the vantage point of Vigeant, Other Secured Creditors and the Senior Cash Flow Creditors.

## 11.0 ACTIONS AND PROCEEDINGS INVOLVING THE DEBTOR

**11.1 Related Definitions.** As used herein:

11.1.1. "Actions" means and includes any and all (i) statutory Actions arising under Sections 542 through 545 and 547 through 549 ("Bankruptcy Actions") and (ii) causes of Action and (iii) all other Actions arising under any other Federal or State Statute or local ordinance or the common law.

11.1.2. "Litigation" or "Proceeding" means and includes adversary proceedings, administrative proceedings, civil actions, equity proceedings, suits at law and all other actions of any and every nature whatsoever although other more descriptive or technical terms may be used as well.

11.1.3. "Defendant" and "Plaintiff" mean and include all instances in which the Debtor is being asked to pay money or be subjected to any other administrative or judicial order, or seeking monetary damages or asking that another person be subjected to any other administrative or judicial order, including cases in which the Debtor is a defendant or plaintiff in the technical sense.

**11.2 Pending Proceedings.** There are no pending Proceedings in which the Debtor is a Plaintiff or Defendant.

**11.3 Contemplated Plaintiff Proceedings.** The Reorganized Debtor will investigate the potential Causes of Action which it will then hold against Vigeant and Credit Suisse.

The Reorganized Debtor reserves the right to file and prosecute those Causes of Action if it determines that either of them are meritorious. Any counsel retained to prosecute either set of Causes of Action will be paid on a contingent fee basis satisfactory to the Reorganized Debtor and counsel. If the Reorganized Debtor chooses not to prosecute either or both of the potential Causes of Action against Vigeant and Credit Suisse within 90 days from the Effective Date, they will revert to the Trustee for the benefit of the Estate.

## 12.0 TAX ATTRIBUTES, BENEFITS AND CONSEQUENCES

**12.1 Special Tax Attributes or Benefits.** The Debtor's certified public accountant, Alfred Lafferty, has advised the Debtor that the Debtor has no special tax attributes, such as net operating loss carry forwards, that have value to Creditors.

**12.2 Tax Consequences to Creditors and Equity Holders.** Implementation of the contemplated Plan may result in federal income tax consequences to Creditors. Tax consequences to a particular Creditor may depend on the particular circumstances or facts regarding the Claim of the Creditor. Consequently, Creditors are urged to consult with their tax advisor in order to determine the tax ramifications of the contemplated Plan under federal and state laws.

## 13.0 ADDITIONAL DISCLOSURES CUSTOMARILY REQUESTED BY U.S. TRUSTEE

**13.1 Absolute Priority Rule; Compliance with LaSalle, If Necessary.**

**13.1.1. Absolute Priority Rule as Explained in LaSalle.** In the Proponent's opinion, the Plan does not implicate the absolute priority rule for the reasons discussed in the following paragraph. The United States Supreme Court

defined the absolute priority rule as follows in *LaSalle*:

> With respect to an impaired class of unsecured creditors, a Plan can be fair and equitable only if, at a minimum, it "provides that each holder of a claim of such class received or retained on account of such claim property of a value, as of the effective date of the Plan, equal to the allowed amount of such claim," [citation omitted] or if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property" *LaSalle*, supra , at 1424.

If the Plan implicates the absolute priority rule, then the current Plan must satisfy the *LaSalle* requirements.

**13.1.2.  Plan Does Not Implicate Absolute Priority Rule in Proponent's Opinion.**  Three conditions must exist before a debtor or Proponent must deal with the "meddlesome" problems arising under *LaSalle* which may prove to be especially difficult for debtors in possession operating small businesses having very limited ability to attract capital as has been and will be more the rule in New Hampshire bankruptcy cases than the exception.  The reorganization plan must be proposed, and, presumably, confirmed before the expiration of the so-called exclusive period during which only a debtor can propose and secure the confirmation of a plan.  *LaSalle* at 1422.  Further, the proposed plan must result in an old equity holder or creditor receiving or retaining property under the plan, including an equity interest in the Reorganized Debtor, without senior creditors being paid in full.

In its current version, the Plan does not implicate the absolute priority rule or require *LaSalle* compliance in the Proponent's opinion.  The Debtor no longer has the exclusive right to propose and to secure the confirmation of a plan since more than

180 days will have elapsed between the Petition Date and the earliest possible confirmation date in this Case. No old equity holder will receive or retain any property under the Plan on account of its interest, if the Plan is confirmed by the Court.

13.1.3. **LaSalle Compliance Motion and Procedure, if Applicable.** As part of the confirmation process, the Proponent will ask the Bankruptcy Court to make a preliminary determination as to whether or not the Plan implicates the absolute priority rule as explained by the Supreme Court in *LaSalle*. A determination or order that the Plan must comply with *LaSalle*.

### 14.0  ADDITIONAL INFORMATION REQUIRED BY IN RE FERRETTI

**14.1 No Acquisition of Claims by Insiders.** No insider of the Debtor has acquired any Claims from any Creditor in this Case except for those disclosed in this Disclosure Statement.

**14.2 No Affiliates.** The Debtor has no affiliates except for those disclosed herein.

### 15.0  LIMITED APPROVAL AND USE OF DISCLOSURE STATEMENT

**15.1 Limited Use of Disclosure Statement.** Only Debtor's Creditors are intended to receive and use the information contained in this Disclosure Statement. It has been prepared by Debtor for the purpose of enabling Creditors to make an informed decision about the merits of the Plan both as a means of reorganizing Debtor's business and finances and as a comparison to the expected results of Debtor's liquidation. Since Debtor believe that the Plan will provide Creditors with an opportunity to receive more than would be distributed if the Debtor's assets were liquidated in a Chapter 7 proceeding, the Debtor urge the Creditors to vote for the Plan.

## 16.0 CONFIRMATION, VOTING AND OBJECTIONS

**16.1 Voting and Confirmation.** After the Chapter 11 Plan has been filed, it is to be sent to the holders of Claims against the Debtor for its consideration and acceptance or rejection. Section 1125 of the Code requires full disclosure before solicitation of acceptances of a Chapter 11 Plan. This Disclosure Statement is presented to holders of Claims against the Debtor to satisfy the requirements of Section 1125 of the Code.

**16.2 Additional Requirements for Confirmation.** After the Chapter 11 Plan has been filed, it is to be sent to the holders of Claims against the Debtor for its consideration and acceptance or rejection. Section 1125 of the Code requires full disclosure before solicitation of acceptances of a Chapter 11 Plan. This Disclosure Statement is presented to holders of Claims against the Debtor to satisfy the requirements of Section 1125 of the Code.

    **16.2.1.**     **Best Interest Test.** Notwithstanding the acceptance of the Plan, the Court must independently determine that the Plan is in the best interest of each holder of a claim or interest impaired under the Plan that has not accepted the Plan. The best interest test requires the Court to find that the Plan provides each such non-accepting holder of a claim in interest impaired under the Plan, a recovery which has a present value at least equal to the present value of the distribution which such holder would receive from Debtor if they were liquidated under Chapter 7 of the Code.

    **16.2.2.**     **Other Provisions of the Plan.** The Plan does include other provisions with regard to retention of jurisdiction by the Court to resolve claims and other matters contemplated in the Plan. The Plan also provides that the Plan may be

modified, withdrawn or revoked prior to the Confirmation Date.

**16.3 Objections and Voting.** The Code and the Bankruptcy Rules allow you several options with regard to the Plan. Creditors may object to the Plan or may vote to accept or reject the Plan. Even if you vote to accept the Plan, your claim may be subject to allowance or disallowance. Confirmation of the Plan will not result in allowance of your claim unless a stipulation is filed as of the Confirmation Date. In the event that your claim is not allowed as of that date or an objection is filed following Confirmation of the Plan, the claim will not be allowed until the Court hears the objection and enters an order regarding the claim. The order confirming the Plan will provide for an objection period.



**EXHIBIT A**

**COMPARISON OF PLAN DIVIDENDS TO LIQUIDATION DISTRIBUTIONS EXCLUSIVE OF INTEREST**

| Class | Liq. Dist. | Dividend Cash Conf. | Div/Unit @ $20,000 | at 50 Plan Div. | at 100 Plan Div. | at 150 Plan Div. | at 200 Plan Div. | at 250 Plan Div. | at 300 Plan Div. | at 350 Plan Div. |
|---|---|---|---|---|---|---|---|---|---|---|
| Administrative Claims Class - $100,000 | $50,000 | $100,000 | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 1 Real Estate Tax Claim Class - $200,000 | $200,000 | $200,000 | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2 Secured Claims Class - $3,400,000 | $2,550,000 | $0 | | $1,000,000 | $1,000,000 | $1,000,000 | $400,000 | $0 | $0 | $0 |
| 3 Senior Unsecured Claims Class - $1,090,000 | $0 | $0 | | 0 | $0 | .$0 | $600,000 | $490,000 | $0 | $0 |
| 4 Junior Unsecured Claims Class - $1,000,000 | $0 | | | $0 | $0 | $0 | $0 | $510,000 | $490,000 | $0 |
| 5 Platinum Construction - $1,900,000 | $0 | | | $0 | $0 | $0 | $0 | $0 | $510,000 | $1,000,000 |
| TOTAL | | $300,000 | | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 |

NOTES

For the purposes of this Table, the Proponent treats Hudson's administrative claim and secured claim as a Class 1 Claim

Hudson would receive first $200,000 in liquidation due to post-petition real estate tax accrual

Does not include brokerage fee despite broker's right to seek "substantial contribution fee"

Cash Confirmation Dividends included in each scenario

Assumes that "Third Deposit" never paid due to engineering and legal costs



# United States Bankruptcy Court

New Hampshire

In re: Shepherds Hill Development Co., LLC

Case No. _____

Debtor

## SUMMARY OF SCHEDULES

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | AMOUNTS SCHEDULED | | |
|---|---|---|---|---|---|
| | | | ASSETS | LIABILITIES | OTHER |
| A - Real Property | Yes | 1 | $7,500,000.00 | | |
| B - Personal Property | Yes | 5 | $200.00 | | |
| C - Property Claimed as Exempt | Yes | 1 | | | |
| D - Creditors Holding Secured Claims | Yes | 1 | | $3,275,000.00 | |
| E - Creditors Holding Unsecured Priority Claims | Yes | 1 | | $0.00 | |
| F - Creditors Holding Unsecured Non Priority Claims | Yes | 3 | | $3,925,915.00 | |
| G - Executory Contracts and Unexpired Leases | Yes | 1 | | | |
| H - Codebtors | Yes | 1 | | | |
| I - Current Income of Individual Debtor(s) | Yes | 1 | | | $0.00 |
| J - Current Expenditures of Individual Debtor(s) | Yes | 1 | | | $0.00 |
| Total Number of Sheets in All Schedules ⇨ | | 16 | | | |
| Total Assets ⇨ | | | $7,500,200.00 | | |
| Total Liabilities ⇨ | | | | $7,200,915.00 | |