UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **In re** <br><br> **SHEPHERDS HILL DEVELOPMENT CO. LLC,** <br><br> **Debtor.** | **Chapter 11** <br><br> **Case No. 99-11087-MAF** |

### OBJECTION TO MOTION FOR DETERMINATION

Balzotti Global Group, LLC ("BGG"), the holder of an allowed claim against Shepherds Hill Development Co., LLC (the "Debtor"), objects to the *Motion for Determination* (the "Motion") [doc. no. 399] filed by the Shepherds Hill Homeowners Association, Inc. (the "Association"). In the first instance, the Motion must be denied because Federal Rule of Bankruptcy Procedure 7001 requires that the relief requested by the Association must be sought in an adversary proceeding. An adversary proceeding is necessary here because, among other things, the factual record is woefully deficient and needs to be developed in order to provide the Court with accurate and complete facts. Even if the Motion were procedurally correct, it should be denied because it requests that the Court permit the Association, which is not a creditor of the Debtor, to take all of the remaining value from the Debtor's assets for no consideration, leaving the Debtor's actual creditors with no source of recovery for their claims. Granting the relief requested in the Motion would result in an undeserved and substantial windfall for the Association and would frustrate the purpose of the Plan. In support of this objection, BGG avers as follows:

1

797019

## BACKGROUND

1. On April 2, 1999 (the "Petition Date"), the Debtor filed a voluntary chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of New Hampshire (the "Court").

2. The Debtor's sole asset was an unfinished residential housing project (the "Project") located in Hudson, New Hampshire. The Debtor owned the real estate and permits necessary to build up to 400 condominium units, but the Project was in its early stages, with some site work and the actual construction of units left to complete. Although the Debtor intended, and the permits provided that the Project would consist of condominium units, the Debtor had not formed or declared a condominium. The Debtor, rather, was the fee owner of the real estate and other rights associated with the Project.

3. On the Petition Date, there were at least three (3) secured creditors of the Debtor, Leonard Vigeant ("Vigeant"), Combat Corporation ("Combat") and the Town of Hudson, as well as approximately $4.6 million of unsecured claims, including the claims of BGG's predecessor in interest.

4. On May 2, 2000, Ralph Caruso, Ernest Thibeault and Caesar Balzotti filed a plan of reorganization which provided that the reorganized Debtor would complete the Project and fund payments to creditors from the sale or financing of individual units. After various amendments, the third amended and modified version of the plan (the "Plan") was confirmed by order dated July 21, 2000 (the "Confirmation Order").

5. The Plan has six (6) classes of claims and one (1) class of equity interests, as follows: (a) Class 1 – Real Estate Tax Claims; (b) Class 2A – Vigeant Secured Claim; (c) Class 2B – Combat Secured Claim; (d) Class 3 – Senior Unsecured Claims; (e) Class 4 – Junior

Unsecured Claims; (f) Class 5 – Subordinate Unsecured Claims; and (g) Class 6 – Equity Interests.

6. The Plan provides that $20,000 from each unit sale or financing will be paid to creditors, in the order of the seniority of their claims, until creditors are paid in full. Creditors in junior classes of claims are not entitled to payment until senior classes of creditors are paid in full. The Plan appointed Edmond Ford as disbursing agent (the "Disbursing Agent") who is responsible for collecting and distributing dividends to the three (3) classes of unsecured claims. *See* Plan §§ 2.3.1, 4.4.2(A), 4.5.2, 4.6.2.

7. The Project was, and remains, the only material source of funds for the payment of the Debtor's creditors. The Plan pledged to use the value of the Project to pay creditors' claims in the order of their priority. The Plan received overwhelming creditor support during the confirmation process.

8. The Plan provides that all classes of secured creditors will retain their liens against the Debtor's real property until such claims are paid in full. The Plan also required the Debtor to enter into a negative pledge agreement (the "Negative Pledge") with the Disbursing Agent "[i]n order to insure that the Reorganized Debtor does not sell the Project in order to avoid satisfying its obligations under the Plan . . . ." Plan §4.4.2(B). The Plan specifically authorized the recording of the Confirmation Order. *Id*. at §2.2.2.

9. The Plan required the reorganized Debtor to form a condominium for the Project. The reorganized Debtor did so, and in February of 2003, the reorganized Debtor filed a declaration of condominium at the registry of deeds. At the time the condominium was declared, the Debtor's real estate was subject to four encumbrances that were authorized under the Plan and were recorded at the registry of deeds: (a) the lien securing Vigeant's claim, (b) the lien

securing Combat's lien, (c) the Negative Pledge, and (d) the Confirmation Order (collectively the "Plan Liens"). The Confirmation Order incorporates the Plan by reference.

10. As of the filing of the Motion, all four of the Plan Liens remain of record at the registry of deeds.

11. Of the three (3) plan proponents, Mr. Caruso and Mr. Thibeault, through their corporate entities, were responsible for developing the Project and generating funds for creditors.

12. Following confirmation of the Plan, the reorganized Debtor in fact constructed approximately 274 of a possible 400 condominium units at the Project. Upon information and belief, the Disbursing Agent executed a release of the Negative Pledge for each of the sales or financings of the condominium units sold at the Project. It is not clear, however, that releases of the Vigeant mortgage and the Negative Pledge were in fact recorded for all 274 units, or whether the Disbursing Agent received all of the funds he was entitled to receive from the construction of all 274 units.

13. What followed the construction of the 274 units, however, was more than ten (10) years of litigation regarding the reorganized Debtor's further management of the Project. The primary result of the litigation was a determination that the reorganized Debtor no longer has the right to exercise the development rights necessary to construct additional units at the Project.

14. Upon information and belief, the Association is seeking to reconstitute the development rights for the Project and has agreed to sell them to a third party for millions of dollars.

797019

**ARGUMENT**

    A.    **The Relief Requested by the Association Must be Requested in an Adversary Proceeding.**

    15.    Among the relief requested by in the Motion is authority for the Association to record a document terminating the Negative Pledge.  Federal Rule of Bankruptcy Procedure 7001 establishes a list of proceedings that are adversary proceedings, which includes "a proceeding to determine the validity, priority, or extent of a lien or other interest in property . . . ."  Fed. R. Bankr. Proc. 7001(2).

    16.    The Negative Pledge was recorded against the Project and its purpose was to insure that the reorganized Debtor performed its obligations under the Plan.  *See* Plan §4.4.2(B).  A release of the Negative Pledge was executed for all or substantially all of the sales or financings of a completed unit at the Project.

    17.    Section 101(37) of the Bankruptcy Code defines a lien as a "charge against or interest in property to secure payment of a debt or performance of an obligation."  11 U.S.C. §101(37).  The Negative Pledge is, accordingly, a lien or other interest in property for the purposes of Federal Rule of Bankruptcy Procedure 7001(2).  The relief requested in the Motion, therefore, must be requested in an adversary proceeding.[1]

    18.    In addition to the clear mandate of Federal Rule of Bankruptcy Procedure 7001(2), an adversary proceeding is necessary in order to develop the facts needed to make a decision in this matter.  By way of only one example, the only version of the Plan currently available, which was filed on the docket by the Association's counsel [doc. no. 394], is missing

---

[1] Upon information and belief, the holder of the Vigeant mortgage asserts that its secured claim (Class 2A under the Plan) has not been paid in full.  Since the Vigeant mortgage is a recorded lien on the Project, the same as the Negative Pledge, the Association, presumably, must remove this lien (as well as the Combat lien and the recorded Confirmation Order) in order to sell any new development rights.  Any such relief must also be requested in an adversary proceeding.

797019

all of its exhibits. Section 5.9 of the Plan incorporates the disclosure statement, yet no party, to BGG's knowledge has a copy of the disclosure statement. The terms of the Plan are integral to the relief requested in the Motion, yet parties, including the Court, do not have a complete version of the Plan or any copy of the disclosure statement. Discovery is necessary in order to develop and present the facts and documents necessary to make a decision in this now twenty-two (22) year old bankruptcy case.

19. For these reasons, the Motion should be denied without prejudice to renewing the relief requested by way of an adversary proceeding.

### B. The Association is Seeking an Undeserved Windfall at the Expense of Creditors.

20. The Plan presented to creditors required that the Debtor use its only material asset, the Project, to generate funds to pay creditors. The method of doing this was to complete the development of the Project. This included declaring a condominium for the Project and creating the Association. *See* Plan §5.4.2. When the condominium was declared, the Project was subject to Plan Liens, and the Plan Liens remain of record at the registry of deeds.

21. The Plan does not permit the discharge of the Plan Liens prior to the payment in full of the claims of the beneficiaries of such liens. *Id*. at §§ 4.1.3, 4.2.3, 4.3.3, 4.4.2(B). Indeed, the Negative Pledge was instituted under the Plan to "insure that the Reorganized Debtor does not sell the Project in order to avoid it obligations under the Plan . . .", and the Plan specifically authorized the recording of the Confirmation Order. *Id*. at §§ 2.2.2, 4.4.2(B). Removing any of the Plan Liens without paying creditors the value of the Project, therefore, would violate the Plan.

22. The Project was the Debtor's only material asset, and its value was promised to creditors under the Plan. While the Debtor's development rights were lost, apparently due to

mismanagement by the reorganized Debtor, the Project remains encumbered by the reorganized Debtor's obligation under the Plan to use the value of the Project to pay creditors' claims. This must be true, otherwise the Association would not need to request the removal of the Negative Pledge (and presumably the other Plan Liens) in order to attempt to monetize the remaining value of the Project.

23. The Association is not a creditor of the reorganized Debtor. It is, nevertheless, seeking to monetize any of the remaining value of the Project and to keep it without paying the reorganized Debtor's legitimate creditors. Permitting this to occur would result in an undeserved windfall for the Association.

    **C.    The Association is Subject to the Plan.**

24. The Association is a creature of the Plan as it would not exist had the Plan not been confirmed. The Project is clearly subject to the Plan. While the Association may not have specifically enumerated obligations under the Plan, if the Association seeks to exercise a property interest in the Project, it is subject to the Plan. This is no different than if a party acquired real estate that was subject to existing mortgages and easements. The party may not have *in personam* obligations with respect to the mortgages and easements, but that party's real estate is subject to the *in rem* restrictions impressed upon the real estate by the mortgages and easements.

25. The Plan provided that the Confirmation Order include an exhibit setting forth "Provisions Relating to Development Permits" (the "Development Provisions"). The Development Provisions are attached to the Confirmation Order as Exhibit B, and impose multiple obligations and restrictions on both the "the present and future" owner of the Project.

*See* Confirmation Order Exh. B. at ¶¶ 5, 6, 7, 7(B), 7(C), 7(D), 10, 11, 12.  The Confirmation Order was recorded at the registry of deeds.

26. The Association contends that all of these provisions are limited in time, and therefore do not now apply, but this is simply incorrect.  *See Id*. at ¶¶ 10, 11, 12.  The Confirmation Order makes clear that the development of the Project under the Plan was meant to extend to any future owner of the Project.  The Association, to the extent it is an owner of the Project, is therefore subject to the Plan and the obligation to use the value of the Project to pay creditors' claims.[2]

## CONCLUSION

27. For the foregoing reasons, the Motion should be denied.

**WHEREFORE**, BGG requests that the Court enter and order denying the Motion and granting BGG such other and further relief as the Court deems proper and just.

Balzotti Global Group, LLC,
By its counsel,

*/s/ D. Ethan Jeffery*
D. Ethan Jeffery (BBO #631941)
MURPHY & KING, Professional Corporation
One Beacon Street
Boston, Massachusetts  02108-3107
Tel: (617) 423-0400
Fax: (617) 556-8985
Email: EJeffery@murphyking.com

Date: May 13, 2021

---

[2] The Association contends that it is the fee owner of the Project.  BGG does not agree that this is correct.  BGG does not agree, moreover, that the Association has any rights under New Hampshire law to further develop the Project.